Filed 2/17/15  P. v. Rodriguez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JESUS MANUEL RODRIGUEZ,<br><br>    Defendant and Appellant. | F065807<br><br>(Super. Ct. No. 1085319)<br><br><br>**OPINION** |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDGAR OCTAVIO BARAJAS,<br><br>    Defendant and Appellant. | (Super. Ct. No. 1085636) |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Nancy Ashley, Judge.

Cara DeVito, under appointment by the Court of Appeal, for Defendant and Appellant Jesus Manuel Rodriguez.

S. Lynne Klein, under appointment by the Court of Appeal, for Defendant and Appellant Edgar Octavio Barajas.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Peter W. Thompson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted Jesus Manuel Rodriguez and Edgar Octavio Barajas (collectively, defendants) of willful, deliberate, and premeditated murder, conspiracy to commit murder, and active participation in a criminal street gang. A firearm enhancement also was found true. Both were juveniles at the time they committed the murder. They challenge their convictions on the grounds the People failed to preserve exculpatory evidence, juror misconduct, insufficient corroboration of accomplice testimony, and instructional error. They also contend their sentences of 50 years to life violate the Eighth Amendment to the United States Constitution. We reject all their contentions and affirm the judgments.

## FACTUAL AND PROCEDURAL SUMMARY

### *Prosecution Evidence*

In May 2004,[1] Oregon Park in Modesto was a known Norteño gang hangout. Gina Lopez, a Police Activities League (PAL) employee, operated an after-school recreational program at Oregon Park for children between the ages of three and 18 years. Lopez usually set up her program under a gazebo.

Lopez was familiar with the people who frequented the park, including Norteño gang members. The Norteños had never caused a problem for Lopez or the PAL program. Lopez had never seen any fights or other problems at the park caused by Norteño gang members.

---

[1]All further references to dates are to the year 2004 unless otherwise noted.

Also in May, 17-year-old Sureño gang member Mario G. lived in Modesto. Rodriguez, then 15 years old, Barajas, then 16 years old, and 16- or 17-year-old Louis A. were fellow Sureño gang members. Mario and Louis lived near Oregon Park. Whenever the Norteños saw Mario or other Sureños hanging around, they would call them names and throw gang signs.

On May 20 Louis was assaulted by Norteños in Oregon Park. The Norteños broke the windows of his van and fired a small handgun at him; Louis ran home. As a result of the assault, Louis's arm was broken. On May 25 Rodriguez was driving to Louis's house when he realized he was being followed by Norteños. When he pulled up at Louis's house, the Norteños used a baseball bat to break the windows of his white Chevy Blazer. Mario was with Rodriguez when this happened.

On May 26 Mario, Barajas, and Rodriguez used Rodriguez's Chevy Blazer to drive to a location to pick up a firearm. Barajas got out of the vehicle and returned carrying a .22-caliber Savage rifle. On the ride home, the three young men discussed the Norteños and exacting revenge.

The three stopped at Mario's house for a short time, at which point fellow Sureños Pedro C. and Rigoberto M. joined them in the Chevy Blazer. Rodriguez was driving, Pedro was in the front passenger seat and was wearing a blue bandanna over his face, Mario was in the backseat behind Pedro, Rigoberto was in the backseat behind Rodriguez, and Barajas was in the rear cargo area holding the .22-caliber rifle. Mario understood they were going to drive to Oregon Park to look for Norteños.

At that time Lopez had about 80 children in her afternoon PAL program. The children were mostly in the area around the gazebo; older children began showing up around 4:00 p.m. The older children included Nadia O., Charlene S., and Delphina A. There were a couple of boys with Delphina on a bench near the gazebo. Around 5:00 p.m. Lopez was under the gazebo talking with Ernestina Tizoc (hereafter Tina or the victim). Lopez did not consider Tina to be a Norteño.

3.

Around 5:30 p.m. Lopez and Nadia noticed a white Chevy Blazer with broken out windows pass by the gazebo area once and drive slowly around the park. As it passed by the gazebo area the second time, someone shouted "Puro Sur," which is Spanish for "Pure South." Nadia saw the occupants of the Chevy Blazer throwing gang signs, specifically, a "13" hand sign, and noticed one occupant with a bandanna over his face. Charlene also heard shouting from the Chevy Blazer and noticed one passenger with a bandanna over his face. Charlene saw a black object being lifted up through a broken window of the Chevy Blazer. Lopez, Nadia, and Charlene then heard multiple gunshots coming from the Chevy Blazer.

Lopez heard Tina scream. Charlene heard Tina yell, "it hit me, it hit me." Nadia heard Tina scream and then someone yell, "They shot Tina, they shot Tina." After the shots were fired, the Chevy Blazer drove off. Lopez called 911. None of the witnesses heard any gunshots being fired from the park. Tina died from her injuries.

Mario, who was in the Chevy Blazer, testified that he, Rodriguez, Barajas, Rigoberto, and Pedro passed through Oregon Park looking for Norteños. Mario thought some people by the gazebo were Norteños because they were wearing red. As the Chevy Blazer approached the gazebo, Barajas shouted "puro Sur" and fired multiple shots. When Barajas stopped shooting, the Chevy Blazer sped away.

Sheriff's Deputy Vincent Hooper arrived at the scene and received information that people at a residence on Thrasher Avenue were involved in the shooting. Hooper and other deputies responded to the address and detained the people located at that residence. Around 7:30 p.m. Hooper was dispatched to an alley, where he found the white Chevy Blazer. Hooper arranged for the Chevy Blazer to be towed to impound for processing. In a subsequent search of the Thrasher Avenue residence, Sheriff's Deputy Edgar Campbell found mail addressed to Louis, gang-related drawings, and two .22-caliber bullets.

On May 27 Rodriguez led Campbell to a location where the .22-caliber rifle was located. Discussions with Rodriguez also led Campbell to .22-caliber casings and .22-caliber bullets at two residences. Campbell inspected the Chevy Blazer that had been impounded; he did not notice any signs that the vehicle had sustained any damage from gunfire.

Sheriff's Detective Mark Copeland first saw the Chevy Blazer the day it was impounded. The next day, May 27, the Chevy Blazer was inspected by Campbell, Crime Scene Officer Brook Mercer, and California Department of Justice Criminalist Duane Lovass. Copeland did not see any bullet holes or evidence that the Chevy Blazer had received gunfire. Lovass also inspected the vehicle and saw no evidence it had sustained gunfire. Copeland was not aware of any exculpatory evidence found in or on the Chevy Blazer.

On July 2 the Chevy Blazer was removed from impound and towed to a private towing company's yard. Copeland testified someone of higher authority made the decision to move the Chevy Blazer and about eight other vehicles from impound. Copeland indicated the sheriff's department was finished with the Chevy Blazer because there was no evidence taken from it. Rodriguez's family was notified it had been taken to the towing company yard.

Rodriguez and Barajas were charged with willful, deliberate, and premeditated murder, conspiracy to commit murder, and active participation in a criminal street gang. The information also alleged, as to the murder and conspiracy counts, that at least one principal intentionally and personally used a firearm, causing great bodily injury or death. It also was alleged that the offenses were committed for the benefit of a criminal street gang.

Forensic Pathologist Sung-Ook Baik testified as an expert on the cause of the victim's death. He testified that the cause of death was a gunshot wound to the chest and that the victim died within 20 minutes of being shot.

Lovass test fired the .22-caliber rifle and compared the expended cartridge to the three shell casings and the bullet recovered from the victim's body. Lovass testified the three shell casings definitely came from the rifle he tested; he stated the bullet recovered from the victim's body could have come from the tested rifle, but he could not determine this with certainty.

Gang expert Froilan Mariscal believed Barajas, Rodriguez, Pedro, and Rigoberto were Sureño gang members on the day of the shooting. Based upon a hypothetical fact pattern similar to the facts of the case, Mariscal opined the drive-by shooting by Sureños would have been intended for the benefit of the gang.

### Defense Evidence

United States Army First Lieutenant Nicholas Garber testified for the defense as an expert on shooting incidents. Garber testified that based upon his combat experience, a person could be shot at and not know the true direction from which the shot was fired. Garber further opined that the gazebo could distort sound, which would make it more difficult to determine the origin of gunshots.

Brothers Nicholas Jones and Jason Jones were in Oregon Park the day of the shooting. Both testified they heard gunshots coming from the park as well as the street.

Anthony Q. also testified he heard gunshots coming from the park that day.

### Rebuttal Evidence

Copeland testified he interviewed the Jones brothers after the shooting. Neither brother mentioned ever hearing gunshots being fired from the park.

### Verdict and Sentence

The jury convicted Rodriguez and Barajas of all counts and found all allegations true.

On September 12, 2012, the trial court sentenced both Rodriguez and Barajas to terms of 50 years to life and credited them with 3,022 days for time served.

## DISCUSSION

Rodriguez and Barajas contend the People acted in bad faith by failing to preserve exculpatory evidence, specifically, the Chevy Blazer. They further claim there was juror misconduct and the trial court abused its discretion in denying their request for juror identifying information and in denying their motion for new trial. Barajas argues there was insufficient evidence independent of accomplice testimony to sustain his convictions. They both contend it was error to instruct the jury with CALCRIM No. 370 and error to fail to instruct the jury that the testimony of one accomplice cannot corroborate the testimony of another accomplice. Finally, they assert that imposing a sentence of 50 years to life is a violation of the Eighth Amendment because it is the functional equivalent of a life sentence and disproportionate to the crimes.

## I.    Preservation of Evidence

Rodriguez and Barajas both claim the trial court erred and infringed on their constitutional due process rights when it denied their motion for dismissal and motion for new trial, which were based upon the claim the People willfully failed to preserve exculpatory evidence. In a related argument, defendants contend the trial court erred when it failed to instruct the jury with modified versions of CALCRIM Nos. 300 (willful suppression of all available evidence is a denial of a fair trial), 306 (untimely disclosure of evidence), and 371 (suppression of evidence).

### *Factual Summary*

Rodriguez's Chevy Blazer was impounded by law enforcement on May 26. Copeland first saw the Chevy Blazer on that date. Copeland, Mercer, and Lovass all inspected the vehicle on May 27. Copeland did not see any bullet holes in the Chevy Blazer and was not aware of any exculpatory evidence found in or on the Chevy Blazer. Lovass also inspected the vehicle and found no evidence of any bullet holes in the Chevy Blazer.

7.

The Chevy Blazer was removed from the sheriff's department's impound yard on July 2 when it was towed to a yard operated by a private company. Copeland testified that someone of higher authority than he decided to have the Chevy Blazer and about eight other vehicles removed from the sheriff's department's impound yard. According to Copeland, at the time the Chevy Blazer was towed from the impound yard, the sheriff's department had finished its inspection of the Chevy Blazer, no evidence was found in the Chevy Blazer, and the Rodriguez family was notified that the Chevy Blazer had been released to the private towing company.

Copeland did not notify the defense attorneys in the case that the Chevy Blazer was being towed and released to a private company. He, however, did speak with the deputy district attorney handling the criminal case and was told that as long as no evidence was found in the Chevy Blazer, the car could be released. After examining the Chevy Blazer, neither the sheriff's department nor the Department of Justice found any evidence in the car.

Rodriguez also filed a motion for a new trial on January 9, 2012, contending that the prosecutor had committed misconduct by failing to assure the Chevy Blazer was available for inspection by the defense.

*Analysis*

The United States Supreme Court has held law enforcement agencies have a duty under the due process clause of the Fourteenth Amendment to preserve evidence "that might be expected to play a significant role in the suspect's defense." (*California v. Trombetta* (1984) 467 U.S. 479, 488; accord, *People v. Beeler* (1995) 9 Cal.4th 953, 976 (*Beeler*).) To fall within the scope of this duty, the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Trombetta,* at p. 489; *Beeler,* at p. 976.)

The state's responsibility is further limited when the defendant's challenge is to "the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." (*Arizona v. Youngblood* (1988) 488 U.S. 51, 57 (*Youngblood*).)  In such cases, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Id*. at p. 58; accord, *Beeler, supra*, 9 Cal.4th at p. 976.)

In California courts, the *Trombetta* and *Youngblood* standards are applied in tandem.  If evidence has an exculpatory value that is apparent before the evidence is destroyed, the *Trombetta* approach applies and the state has a duty to preserve it.  But "[t]he state's responsibility is [more] limited when" the evidence is merely potentially useful.  (*Beeler, supra,* 9 Cal.4th at p. 976.)  In that case, the state breaches its duty only if it acts in bad faith.  (*Ibid.*)

If a defendant demonstrates that significant exculpatory evidence was lost or establishes bad faith in connection with the loss of potentially useful evidence, then the trial court has discretion to impose appropriate sanctions.  (*People v. Medina* (1990) 51 Cal.3d 870, 894.)

Negligent destruction or failure to preserve potentially exculpatory evidence, without evidence of bad faith, will not give rise to a due process violation.  (*Youngblood, supra*, 488 U.S. at p. 58.)  A finding as to "whether evidence was destroyed in good faith or bad faith is essentially factual:  therefore, the proper standard of review is substantial evidence." (*People v. Memro* (1995) 11 Cal.4th 786, 831.)  On review, this court must determine whether, viewing the evidence in the light most favorable to the trial court's finding, there was substantial evidence to support its ruling.  (*People v. Carter* (2005) 36 Cal.4th 1215, 1246 (*Carter*).)

Here, substantial evidence supported the trial court's finding that the failure to maintain possession of the Chevy Blazer was not in bad faith and therefore not a

9.

constitutional due process violation. There was no evidence further examination of the Chevy Blazer would have disclosed exculpatory evidence or that the sheriff's department knew of any potential exculpatory value to the Chevy Blazer.

The record discloses that no fewer than three law enforcement officials inspected the Chevy Blazer, and no bullet holes were found in the vehicle. At the time the Chevy Blazer was released, no witness had indicated that any gunshots were fired from the park. Any claim by defendants that the Chevy Blazer had bullet holes that were missed by three law enforcement professionals is purely speculative. The mere possibility that evidence may ultimately prove exculpatory is not enough to trigger a duty to preserve the evidence. (*City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 8.)

There is no indication the release of the Chevy Blazer was an attempt to deprive defendants of potentially exculpatory evidence and thus no evidence of bad faith or any due process violation.

We also reject the related contention that the trial court erred when it failed to instruct the jury with modified versions of CALCRIM Nos. 300, 306, and 371. When, as here, there is no *Trombetta/Youngblood* violation, the trial court is not required to impose any sanction, including jury instructions. (*People v. Cooper* (1991) 53 Cal.3d 771, 811.) It is not error to fail to give a cautionary instruction when there is no *Trombetta* violation. (*People v. Huston* (1989) 210 Cal.App.3d 192, 215.)

## II.    Accomplice Testimony

Barajas contends his convictions must be reversed in their entirety because the only evidence connecting him to the crimes was the testimony of an accomplice.

### *Factual Summary*

Mario, who was in the Chevy Blazer and was an accomplice to the crimes, testified for the prosecution. He testified that the day before the shooting, rival Norteños smashed the Chevy Blazer's windows. He and other Sureños, including Rodriguez and

10.

Barajas, talked about shooting at Norteños as payback for smashing the windows of the Chevy Blazer.

Mario testified that on the day of the shooting he, Rodriguez, Barajas, Rigoberto, and Pedro drove by Oregon Park looking for Norteños. Mario saw some people standing by the gazebo wearing red. Pedro was wearing a blue bandanna, or rag, over his face. As the Chevy Blazer approached the gazebo, Barajas, who was in the rear cargo area of the Chevy Blazer, shouted "puro sur" and fired multiple gunshots in the direction of the people by the gazebo. After Barajas finished shooting, the Chevy Blazer sped away. Mario testified that Barajas used a .22-caliber rifle in the shooting. Mario did not recall any gunshots being fired toward the Chevy Blazer.

### *Analysis*

"A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." (Pen. Code, § 1111.) Adequate corroboration of an accomplice's testimony need not in itself be sufficient to convict the defendant; it may be slight and entitled to little consideration when standing alone. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1128 (*Rodrigues*); *People v. Douglas* (1990) 50 Cal.3d 468, 507 (*Douglas*).) It need only "*tend*[] to connect the defendant with the crime so that the jury may be satisfied that the accomplice is telling the truth." (*Douglas*, at p. 506.) The corroborating evidence may be circumstantial and may consist of a defendant's conduct or statements. (*Id.* at p. 507.) It thus may be evidence that shows a consciousness of guilt. (*People v. Hurd* (1970) 5 Cal.App.3d 865, 875.)

The corroborating evidence must tend to connect the defendant to the crime, but it has to neither establish every element of the offense nor corroborate all of the accomplice's testimony. (*People v. Heishman* (1988) 45 Cal.3d 147, 164-165.) Although the corroborating evidence need only tend to connect the defendant to the crime, it must do more than raise a mere conjecture or suspicion of guilt. (*People v.*

11.

*Szeto* (1981) 29 Cal.3d 20, 27.)  "[I]t is not sufficient to merely connect a defendant with the accomplice or other persons participating in the crime.  The evidence must connect the defendant with the crime, not simply with its perpetrators."  (*People v. Falconer* (1988) 201 Cal.App.3d 1540, 1543.)

"'A defendant's own conduct, declarations and testimony may furnish adequate corroboration for the testimony of an accomplice.'"  (*People v. Williams* (1997) 16 Cal.4th 635, 680; accord, *People v. Avila* (2006) 38 Cal.4th 491, 563 (*Avila*) ["Defendant's initial attempt to conceal from the police his involvement in the activities culminating in the murders implied consciousness of guilt constituting corroborating evidence."].)  False and contradictory statements of a defendant regarding the charge are material corroborating evidence.  (*People v. Santo* (1954) 43 Cal.2d 319, 327; *People v. Taylor* (1924) 70 Cal.App. 239, 244; *People v. McLean* (1890) 84 Cal. 480, 481 [accomplice testimony sufficiently corroborated by evidence the defendant "made contradictory statements concerning his whereabouts on the night of the fire" and "took measures to get the accomplice to leave that part of the country"].)

"'The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime.'"  (*People v. Abilez* (2007) 41 Cal.4th 472, 505; *People v. McDermott* (2002) 28 Cal.4th 946, 986; see *People v. Narvaez* (2002) 104 Cal.App.4th 1295, 1303.)

Nonaccomplice evidence corroborated the testimony of Mario.  Nonaccomplice testimony from Nadia established that the shooter was in the back of the Chevy Blazer.  Nadia also testified that one of the people in the Chevy Blazer had a bandanna over his face.  Lopez, who was not an accomplice, testified she heard "Puro Sur" shouted from the Chevy Blazer.  Nadia and Lopez both testified that the windows were broken out of the Chevy Blazer used by the shooters.

Campbell recovered three .22-caliber shell casings from near where the Chevy Blazer was left after the shooting. Lovass testified these shell casings were fired from the rifle identified by Mario as the murder weapon and that a .22-caliber bullet was removed from the victim's body.

The People's gang expert testified Rodriguez and Barajas were members of the Sureño gang; the Sureños are rivals of the Norteños. Gang members commit crimes against rival gang members to send a message to the rivals. The gang expert also testified that Sureños use the word "sur," which is Spanish for "south."

Circumstantial evidence is sufficient to corroborate the testimony of an accomplice, and slight evidence may be sufficient corroboration. (*Rodrigues, supra,* 8 Cal.4th at p. 1128.) Barajas ignores the evidence when he claims the only evidence connecting him to the crime came from an accomplice. Nadia, Lopez, Campbell, Lovass, and the gang expert all corroborated portions of Mario's testimony. The nonaccomplice testimony helped establish a motive for the shooting and helped identify Barajas as the shooter. This evidence was sufficient to tend to connect Barajas to the crime. (*Douglas*, *supra*, 50 Cal.3d at pp. 506-507.)

## III. Instructional Issues

Barajas contends the trial court erred when it failed to instruct the jury with the bracketed portion of CALCRIM No. 335, which states that the testimony of an accomplice cannot corroborate the testimony of another accomplice. Rodriguez claims the trial court erred by instructing the jury with CALCRIM No. 370, which provides that proof of motive is not required without further instructing that motive is an element of the gang enhancement. Barajas joins in this argument.

### *Accomplice Instruction*

The trial court instructed the jury with CALCRIM No. 335 (Accomplice Testimony: No Dispute Whether Witness Is Accomplice). The trial court omitted the bracketed sentence that states the evidence needed to support the statement or testimony

13.

of one accomplice cannot be provided by the statement or testimony of another accomplice. The trial court also instructed the jury that if crimes were committed, Mario was an accomplice to those crimes as a matter of law. Additionally, the jury was instructed that Rodriguez's out-of-court statements could be used only against Rodriguez and not any other defendant.

Barajas contends the trial court should have instructed the jury that if crimes were committed, then Rodriguez was an accomplice as a matter of law and his statement could not be used as corroborating evidence to support Mario's testimony. Barajas is mistaken.

We first note that no objection to the instruction as given and no request for modification or clarification was made by Barajas during trial. Barajas argues, however, that his failure to object did not result in forfeiture because the alleged error affected his substantial rights (Pen. Code, § 1259 ["The appellate court may … review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"]), and a claim that a jury instruction is legally incorrect may be raised on appeal even in the absence of an objection below (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012).

The instruction given by the trial court was correct. It appears, however, that Barajas is asserting the trial court should have clarified or amplified the instruction. In the absence of a request, however, a trial court is under no obligation to amplify or explain an instruction. (*People v. Coddington* (2000) 23 Cal.4th 529, 584; *People v. Bonin* (1989) 47 Cal.3d 808, 856; *People v. Anderson* (1966) 64 Cal.2d 633, 639.)

We, nevertheless, shall address the merits of Barajas's contention. It would have been error for the trial court to instruct that Rodriguez was an accomplice as a matter of law. (*People v. Hill* (1967) 66 Cal.2d 536, 555.) Whether Rodriguez was guilty of participating in any of the crimes, or an accomplice, was a question of fact for the jury to decide. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 104.)

14.

As for Rodriguez's out-of-court statement, the jury was instructed that the statement was of limited use and could be used only against Rodriguez and not against any other defendant. The jury also was instructed to "separately consider the evidence as it applies to each defendant" and to "decide each charge for each defendant separately."

Even assuming the trial court should have included the bracketed portion of CALCRIM No. 335 that was omitted, such failure may not be reversible error. The failure to instruct the jury regarding accomplice testimony is subject to harmless error analysis under *People v. Watson* (1956) 46 Cal.2d 818, 837. (*Avila, supra,* 38 Cal.4th at p. 562.)

"A trial court's failure to instruct on accomplice liability under [Penal Code] section 1111 is harmless if there is sufficient corroborating evidence in the record. [Citation.] 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. [Citations.]' [Citation.] The evidence 'is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.'" (*People v. Lewis* (2001) 26 Cal.4th 334, 370.)

As set forth in part II., *ante,* there was sufficient corroborating evidence from nonaccomplices to corroborate Mario's testimony and connect Barajas to the crimes.

In addition, the jury was instructed concerning the factors to consider in evaluating witness testimony, including whether the witness's testimony was "influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided," as well as whether the witness "was promised immunity or leniency in exchange for his or her testimony." (See CALCRIM No. 226.) CALCRIM No. 335, as given, instructed the jury to view with caution any "statement or testimony of an accomplice that tends to incriminate the defendant." Thus, to the extent the point was not readily apparent without instruction, these factors

15.

suggested that Mario's complicity in the crimes was a factor to be considered in determining his credibility.

The jury is presumed to have followed all of the trial court's instructions, including CALCRIM No. 226, the accomplice instructions in CALCRIM No. 335, the limiting instruction on the use of Rodriguez's out-of-court statement, and the instruction to consider the charges and evidence against each defendant separately. (*Carter, supra,* 36 Cal.4th at pp. 1176-1177.)

Under these circumstances, it is not reasonably probable that the jury would have reached a result more favorable to Barajas had the omitted bracketed portion of CALCRIM No. 335 been given. (See, *Avila, supra,* 38 Cal.4th at p. 563.)

### CALCRIM No. 370

Rodriguez claims the trial court erred by instructing the jury with CALCRIM No. 370, which informed the jury that the People were not required to prove defendants had a motive to commit any of the charged crimes. He contends this was error because motive is an element of the gang enhancement. Barajas joins in this contention. We disagree.

Rodriguez acknowledges that this court considered, and rejected, this contention in *People v. Fuentes* (2009) 171 Cal.App.4th 1133, 1139-1140 (*Fuentes*). He asks this court to reconsider its conclusion; we decline to do so.

Motive and intent are not synonymous. (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1322.) "Motive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504.)

As we stated in *Fuentes,* a defendant's intent to further criminal gang activity is not a motive any more than any other specific intent; just as intent to kill is not a motive. (*Fuentes, supra,* 171 Cal.App.4th at p. 1139.) While Rodriguez and Barajas challenge the giving of CALCRIM No. 370, only as it applies to the gang enhancement, our decision in *Fuentes* applied to the gang offense as well. (*Fuentes,* at p. 1139.)

16.

CALCRIM No. 370 instructed the jury that the People were not required to prove any motive to commit the charged crimes.  CALCRIM No. 1401 instructed on the gang enhancement and provided that the People must prove Rodriguez and Barajas intended to further gang activity.  These instructions correctly informed the jury that the People must prove Rodriguez and Barajas "intended to further gang activity but need not show what motivated" them to do so.  (*Fuentes, supra,* 171 Cal.App.4th at pp. 1139-1140.)

## IV.     Motion for Juror Contact Information

Rodriguez filed a posttrial motion for release of juror contact information.  In that motion Rodriguez alleged jurors had committed misconduct in that they "willfully ignored the courts [*sic*] instructions regarding the use of evidence and instead utilized their personally perceived expertise, or the perceived expertise of other jurors, in place of evidence presented at trial."  The trial court denied the motion, which Rodriguez contends was an abuse of its discretion.

### *Standard of Review*

"A criminal defendant has neither a guaranty of posttrial access to jurors nor a right to question them about their guilt or penalty verdict."  (*People v. Cox* (1991) 53 Cal.3d 618, 698-699.)  "'[S]trong public policies protect discharged jurors from improperly intrusive conduct in all cases.'  [Citations.]  The uncontrolled invasion of juror privacy following completion of service on a jury is, moreover, a substantial threat to the administration of justice.  [Citations.]  These concerns, however, must be balanced with the equally weighty public policy that criminal defendants are entitled to jury verdicts untainted by prejudicial juror misconduct."  (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1092.)

Code of Civil Procedure sections 206 and 237 govern petitions for disclosure of juror identifying information, which information is automatically sealed upon the recording of a verdict in a criminal case.  (*Id.,* § 237, subd. (a)(2).)  Section 206 authorizes a criminal defendant to petition pursuant to section 237 for access to personal

17.

juror identifying information when the sealed information is "necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose." (*Id.*, § 206, subd. (g).) Section 237 provides that the petition must be supported by a declaration that includes facts sufficient to establish good cause for the release of juror information. If the trial court determines the petition and supporting declaration establish a prima facie showing of good cause for release of juror information, the trial court must set a hearing, unless the record establishes a compelling interest against disclosure. (*Id.*, subd. (b).) If a hearing is set, then the trial court shall give the former juror or jurors notice they may appear in person or in writing to protest the granting of the petition. (*Id.*, subd. (c).) A former juror's protest shall be sustained if, in the trial court's discretion, "the petitioner fails to show good cause, the record establishes the presence of a compelling interest against disclosure … or the juror is unwilling to be contacted by the petitioner." (*Id.*, subd. (d).) The trial court's ruling is reviewed for abuse of discretion. (*People v. Jones* (1998) 17 Cal.4th 279, 317.)

*Analysis*

In support of the motion for juror contact information, Rodriguez submitted a declaration from defense investigator Mari Cicinato purporting to relate statements made to her by Jurors Nos. 3, 7, 10, and 11 in which those jurors related statements purportedly made by other jurors during deliberations regarding those jurors' personal experiences with firearms. The statements Cicinato reports in her declaration are double hearsay. (Evid. Code, § 1200.) Hearsay does not trigger any duty on the part of the trial court to investigate or release juror contact information. (*Avila, supra,* 38 Cal.4th at p. 605.)

Moreover, even if jurors applied their personal experiences in evaluating the evidence in the case, it is not misconduct. The Supreme Court addressed a similar issue in *People v. Steele* (2002) 27 Cal.4th 1230 (*Steele*). The defendant argued that jurors with military experience and medical experience offered their expertise during

deliberations. While discussing the issue, the Supreme Court made the following pertinent observation:

> "A juror may not express opinions based on asserted personal expertise that is different from or contrary to the law as the trial court stated it or to the evidence, but if we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow those jurors to use their experience in evaluating and interpreting that evidence. Moreover, during the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence. We cannot demand that jurors, especially lay jurors not versed in the subtle distinctions that attorneys draw, never refer to their background during deliberations. 'Jurors are not automatons. They are imbued with human frailties as well as virtues.' [Citation.]

> "A fine line exists between using one's background in analyzing the evidence, which is appropriate, even inevitable, and injecting 'an opinion explicitly based on specialized information obtained from outside sources,' which we have described as misconduct." (*Steele,* 27 Cal.4th at p. 1266.)

Here, the jurors used their personal experiences to evaluate the evidence presented at trial. Specifically, their own experiences with firearms led them to discredit defense expert witness Garber's testimony. Evaluating testimony in light of their own personal experiences, however, does not constitute misconduct. (*Steele, supra,* 27 Cal.4th at p. 1266.)

Rodriguez failed to establish a prima facie case of misconduct warranting release of juror contact information. Therefore, the trial court did not abuse its discretion in denying the motion.

## V.     New Trial Motion

Rodriguez contends the trial court abused its discretion when it denied his motion for a new trial based upon juror misconduct. Barajas joins in this contention.

In the new trial motion filed by Rodriguez, and joined by Barajas, Rodriguez asserted that juror misconduct had occurred in that jurors used "their personally perceived expertise, or the perceived expertise of other jurors, in place of evidence presented at trial."

19.

Here, Rodriguez and Barajas contend that jurors concealed personal information during voir dire. Allegedly, the jurors introduced outside evidence (their personal expertise) into the deliberations, and the outside evidence was received by all the jurors. Rodriguez and Barajas assert these acts constitute misconduct. They are mistaken.

*Analysis*

Penal Code section 1181 sets forth the grounds upon which a new trial may be granted, including receipt of out-of-court evidence and juror misconduct. (*Id.,* subds. (2), (3).) In ruling on a motion for new trial, the trial court undertakes a three-step analysis, the first step of which is to determine whether the affidavits submitted in support of the motion are admissible under Evidence Code section 1150. (*People v. Perez* (1992) 4 Cal.App.4th 893, 906.) A trial court has broad discretion in ruling on this determination and its rulings will not be disturbed absent a clear abuse of discretion. (*Ibid.*)

Here, as discussed in part IV., *ante*, the affidavits submitted in support of the motion for new trial contained inadmissible hearsay. (Evid. Code, § 1200; *People v. Williams* (1988) 45 Cal.3d 1268, 1318.) There was no competent evidence presented that any juror introduced any outside information into the deliberations and that this outside information was received by all the jurors. Lacking any competent evidence in support of the motion, a denial of the motion on this basis alone was warranted. (*People v. Dykes* (2009) 46 Cal.4th 731, 812-813 (*Dykes*).)

Furthermore, as set forth in part IV., *ante*, even if there was competent evidence of comments made by jurors during deliberations regarding their personal experiences with firearms, evaluating testimony in light of their own personal experiences does not constitute misconduct. (*Steele, supra,* 27 Cal.4th at p. 1266.)

Also, the record does not support the claim that these jurors concealed relevant disqualifying information during voir dire. Rodriguez and Barajas argue the jurors expressly were asked whether they "had any involvement with firearms." Defendants

claim these jurors concealed information about their firearm experiences and, had defense counsel known of these experiences, peremptory challenges would have been exercised.

The jurors, however, never were asked if they "had any involvement with firearms." The trial court asked the jurors if "anybody close to [them had] been charged with firearm offenses" or if they had been a "victim of an offense of any kind." None of the prospective jurors ever was asked about whether he or she had personal experience with firearms or military service. The record fails to support any claim of concealment by a juror.

And the claim that a peremptory challenge would have been exercised on any juror with firearms experience is pure speculation. Presumably, if defense counsel thought firearms experience sufficiently important to disqualify a juror, he or she would have asked the venire panel, or would have had the trial court ask, this question.

### *Conclusion*

The motion for new trial was not supported by any competent evidence; consequently, denial was warranted on that basis alone. (*Dykes, supra,* 46 Cal.4th at pp. 812-813.) Even if the statements from the jurors set forth in the defense investigator's declaration had been admissible, the statements did not reveal misconduct. Jurors evaluating testimony in light of their own personal experiences does not constitute misconduct. (*Steele, supra,* 27 Cal.4th at p. 1266.)

## V.    Sentencing Issues

Both Rodriguez and Barajas were sentenced to terms of imprisonment of 50 years to life with the possibility of parole. Both contend their sentences constitute cruel and unusual punishment and violate the Eighth Amendment. In addition, they argue the sentences are disproportionate to the offense. We disagree.

*Eighth Amendment Analysis*

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment. Embodied in the Eighth Amendment is the concept of proportionality; in other words, punishment for the crime should be proportional to the offense and sentences that are grossly disproportionate violate the Eighth Amendment. (*In re Coley* (2012) 55 Cal.4th 524, 538.) In *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455] (*Miller*), the United States Supreme Court held that mandatory life imprisonment without the possibility of parole for juveniles convicted of murder violates the Eighth Amendment. (*Miller,* at p. ___ [132 S.Ct. at p. 2469].)

In *Graham v. Florida* (2010) 560 U.S. 48, the United States Supreme Court banned outright life without parole sentences for juveniles convicted of nonhomicide offenses. As stated in *Graham*:

> "A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give [juvenile] defendants … some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to explore the means and mechanisms for compliance. It bears emphasis, however, that while the Eighth Amendment forbids a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life. Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society." (*Id.* at p. 75.)

In *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), the California Supreme Court held that the proscription in *Graham* against life without parole for nonhomicide offenses applied equally to sentences that were the functional equivalent of a life without parole sentence. (*Caballero,* at p. 268.) "Sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the

22.

juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment." (*Ibid.*) In *People v. Mendez* (2010) 188 Cal.App.4th 47, the appellate court concluded that a juvenile offender's sentence of 84 years to life violated the Eighth Amendment because it was the functional equivalent of life without parole. (*Mendez,* at pp. 50-51.) The appellate court in *People v. Perez* (2013) 214 Cal.App.4th 49, however, held a sentence of 30 years to life for a 17-year-old juvenile offender did not violate the Eighth Amendment because it was not the functional equivalent of a life sentence. (*Perez,* at p. 58.)

Here, according to the abstract of judgment, Rodriguez was 24 years old at the time of sentencing. He received a sentence of 50 years to life, with credit for 3,022 days in custody; the credit equates to over eight years. Barajas was 25 years old at the time of sentencing and also received a term of 50 years to life, with credit for 3,022 days in custody. According to the Social Security Administration's Actuarial Life Table,[2] at the time of sentencing Rodriguez and Barajas each had a life expectancy of slightly over 77 years.

They would be incarcerated for slightly less than 42 years after sentencing, calculated by deducting the 3,022 days of credit from a 50-year term. This means Rodriguez would be eligible for parole at 66 years of age and Barajas at 67 years of age, a decade or more before the end of their anticipated life expectancy. The appellate court in *Perez* did not specifically define how much anticipated life expectancy has to remain at the time a defendant becomes eligible for parole. There must be "'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" (*People v. Perez, supra,* 214 Cal.App.4th at pp. 57-58.)

---

[2]Available at <http://www.ssa.gov/OACT/STATS/table4c6.html> (as of Feb. 17, 2015).

Barajas claims several studies indicate people who are incarcerated have a reduced life expectancy. That, however, is not a factor in determining whether the sentence is the functional equivalent of a life sentence. Barajas has not cited a case that so holds and our review of *Caballero* and the authorities cited therein disclose the court was addressing a natural life expectancy, with no modification for any factors that may lessen a normal life expectancy. (*Caballero, supra,* 55 Cal.4th at pp. 266-268.) Furthermore, as the "state is by no means required to guarantee eventual freedom to a juvenile convicted of a nonhomicide offense," the state can hardly be required to guarantee eventual freedom to one, like Barajas, convicted of homicide. (*Id.* at p. 266.)

The sentences of 50 years to life are not the functional equivalent of a life term. Rodriguez and Barajas will become eligible for parole well within their natural life expectancy. (*People v. Perez, supra,* 214 Cal.App.4th at p. 58.) Because the sentences are not the functional equivalent of a life term, the trial court was not required to engage in a proportionality analysis. (*Miller, supra,* 567 U.S. at p. ___ [132 S.Ct. at pp. 2463-2464].)

### *Sentence Not Disproportionate*

The Eighth Amendment also precludes punishment that is disproportionate to the crime, and both Rodriguez and Barajas contend their sentences of 50 years to life are disproportionate to the crime. Proportionality challenges to noncapital sentences are rarely successful. (*Rummel v. Estelle* (1980) 445 U.S. 263, 374, 272.) The challenge here is similarly unsuccessful.

Rodriguez was on juvenile probation when the instant crimes occurred and his performance on juvenile probation had been unsatisfactory. The victim was not a gang member, but an innocent bystander participating in a children's after-school program. Rodriguez was a Sureño gang member and acting in concert with other Sureño gang members in connection with the shooting. The nature of the offense, the gang affiliation, the participation in previous crimes before the shooting, and the danger to society

24.

presented by shooting into a group of children all are factors indicating the sentence was not disproportionate to the crime.  (*People v. Em* (2009) 171 Cal.App.4th 964, 972 (*Em*) [sentence of 50 years to life imposed on 15-year-old aider and abettor to murder was not disproportionate considering seriousness of crime and defendant's gang affiliation and danger to society].)

The sentence imposed on Barajas also was not disproportionate.  He, too, was a member of the Sureño gang and acting in concert with other gang members at the time of the shooting.  Barajas was the shooter who fatally shot the victim.  While Barajas did not have a prior criminal record, he had a history of gang affiliation and shot a .22-caliber rifle into a group of students at a public park.  Considering the callousness of the offense, and his gang affiliation, the sentence imposed on Barajas was not disproportionate.  (*Em, supra,* 171 Cal.App.4th at p. 972.)

## DISPOSITION

The judgments are affirmed.  Barajas's motion to strike references in codefendant Rodriguez's opening brief to statements made by Barajas that the trial court ordered stricken is granted.

_____
CORNELL, Acting P.J.


WE CONCUR


_____
KANE, J.


_____
POOCHIGIAN, J.

25.